444 F.3d 135
 Kevin DEEGAN, Plaintiff-Appellant,
v.
CITY OF ITHACA, Mariette Geldenhuys, in Her Official Capacity as City Attorney of the City of Ithaca, and Richard Basile, in His Official Capacity as Chief of Police of the City of Ithaca, Defendants-Appellees,
Docket No. 04-4708 CV.
 United States Court of Appeals, Second Circuit.
 Argued: July 11, 2005.
 Decided: April 6, 2006.
 
 COPYRIGHT MATERIAL OMITTED Nathan W. Kellum, Alliance Defense Fund, Memphis, Tennessee, for Plaintiff-Appellant.
 Timothy J. Perry, Sugarman Law Firm, Syracuse, New York, for Defendants-Appellees.
 Before: WESLEY and HALL, Circuit Judges, SCULLIN, District Judge.*
 HALL, Circuit Judge.
 
 
 1
 Plaintiff-Appellant Kevin Deegan commenced this action, pursuant to 42 U.S.C. §§ 1983 & 1988, seeking damages as well as declaratory and injunctive relief against the City of Ithaca, New York, the City Attorney Marriette Geldenhuys, and the Chief of Police Richard Basile (collectively, "Defendants"). Deegan alleged that his First and Fourteenth Amendment rights were violated when he was prevented, under the purported authority of municipal noise ordinances, from preaching in Ithaca Commons. Following discovery, the District Court entertained cross motions for summary judgment and resolved the case on a record consisting of facts stipulated by the parties and the testimony of Deegan's noise expert. The District Court granted Defendants' motion and dismissed the complaint.
 
 
 2
 We find that the challenged noise ordinances, as interpreted, construed, and enforced by Defendants against Deegan cannot withstand constitutional scrutiny. Therefore, we remand the case to the District Court with instructions to enter judgment in favor of Deegan and award him appropriate relief.
 
 
 BACKGROUND
 
 
 3
 Plaintiff Kevin Deegan, a resident of West Seneca, New York, believes that he has a duty as a Christian to preach, and he has carried out that tenet of his faith for more than twenty years by speaking in raised voice to passers-by in public areas such as parks, malls, streets and sidewalks. In Deegan's view, that method of communication enables him to reach as many people as possible and stimulate dialogue about his religious beliefs. With that purpose, Deegan and three of his colleagues visited Ithaca Commons on October 9, 1999.
 
 
 4
 Ithaca Commons is a two block, "T" shaped public pedestrian mall located in downtown Ithaca with walkways, benches, a playground, storefront businesses, restaurants, several pavilions, and a water fountain with nearby seating. In addition to attracting patrons to the many businesses located on the Commons, the area serves as a general gathering place and a popular "hang out" for students from nearby colleges. Musicians and other entertainers perform regularly in the Commons, which is also the site of numerous community events, such as the Downtown Ithaca Chili Cookoff and Winterfest, Ithaca Festival Craft Show, M & T Bank Summer Concert Series, and the Apple Harvest Festival, which draw thousands of visitors and feature exhibitions, concerts, poetry readings, and dance, among other things. It has also been a forum for demonstrations and protests highlighted by speeches, music performances, marches, and open discussion concerning a variety of issues including nuclear weapons, environmental protection, animal rights, gay and lesbian rights, and campaign finance reform.
 
 
 5
 Shortly after Deegan and his colleagues positioned themselves in the middle of the "T" and began preaching, Deegan was approached by an Ithaca police officer who was responding to a noise complaint lodged by an employee of a nearby business; no one else complained about Deegan's preaching. The officer did not interview the complainant or other witnesses; rather, upon hearing Deegan and his companions, the officer advised him that their speech violated the Ithaca noise ordinance because it could be heard from 25 feet away in the Ithaca Commons area and further advised him to keep the volume of his speech lower. When Deegan asked whether he could relocate to a street corner outside of the Commons, the officer informed him that the ordinance applies anywhere in the city. At Deegan's request, the officer left to get a copy of the ordinance.
 
 
 6
 While the officer was away, Deegan heard a singing group 200 feet from his location and heard people talking who were more than 25 feet from him; they were left undisturbed and there is nothing in the record regarding complaints about other people. Although Deegan attempted to speak more softly, when the officer returned ten minutes after departing, he told Deegan that even the lower volume violated the ordinance. The officer provided Deegan with a copy of the Ithaca noise ordinance. After reviewing the statute, Deegan voiced disagreement that its provisions required him to speak so low as not to be heard 25 feet away, but the officer informed him that he had to keep his voice at that level or face arrest. The officer described Deegan as delivering his speech "persistently and continuously" and speaking at the "top of his lungs." Deegan chose not to communicate his message by speaking in a volume that carried no more than 25 feet or by circulating brochures, and he did not seek a permit to use amplified sound. Concluding that he could not communicate effectively and also comply with the ordinance, Deegan left Ithaca on October 9, 1999, never to return to preach because his subsequent request for permission to speak in a voice that is audible at a distance of more than 25 feet was denied by Defendants.
 
 
 7
 Section 240-4 of the City of Ithaca Municipal Code provides in relevant part:
 
 
 8
 § 240-4. Unreasonable noise prohibited.
 
 
 9
 A. No person shall intentionally cause public inconvenience, annoyance or alarm or recklessly create a risk thereof by making unreasonable noise or by causing unreasonable noise to be made.
 
 
 10
 B. For the purpose of implementing and enforcing the standard set forth in Subsection A of this section, "unreasonable noise" shall mean any sound created or caused to be created by any person which either annoys, disturbs, injures or endangers the comfort, repose, health, peace or safety of the public or which causes injury to animal life or damages to property or business. Factors to be considered in determining whether unreasonable noise exists in a given situation include but are not limited to any or all of the following:
 
 
 11
 (1) The intensity of the noise.
 
 
 12
 (2) Whether the nature of the noise is usual or unusual.
 
 
 13
 (3) Whether the origin of the noise is associated with nature or humanmade activity.
 
 
 14
 (4) The intensity of the background noise, if any.
 
 
 15
 (5) The proximity of the noise to sleeping facilities.
 
 
 16
 (6) The nature and the zoning district of the area within which the noise emanates and of the area within 500 feet of the source of the sound.
 
 
 17
 (7) The time of the day or night the noise occurs.
 
 
 18
 (8) The time duration of the noise.
 
 
 19
 (9) Whether the sound source is temporary.
 
 
 20
 (10) Whether the noise is continuous or impulsive.
 
 
 21
 (11) The volume of the noise.
 
 
 22
 (12) The existence of complaints concerning the noise from persons living or working in different places or premises who are affected by the noise.
 
 
 23
 Municipal Code of the City of Ithaca, New York § 2404 (the "Noise Ordinance"). Joint Stipulation ¶ 34. Ithaca Commons also has an ordinance regulating amplified sound, which provides in relevant part as follows:
 
 
 24
 § 157-18. Amplified sound.
 
 
 25
 A. Except by special permit ... no person shall operate or cause to be operated on Ithaca Commons any boom box, tape recorder, radio or other device for electronic sound amplification in a loud, annoying or offensive manner such that noise from the device interferes with conversation or with the comfort, repose, health or safety of others within any building or at a distance of 25 feet or greater.
 
 
 26
 Municipal Code of the City of Ithaca, New York § 157-18 (the "Sound Amplification Rule"). Joint Stipulation ¶ 35. There is nothing in the Joint Stipulation to suggest that Deegan was provided with a copy of Section 157-18 on October 9, 1999. With respect to the enforcement of the two noise ordinances, the parties stipulated that Defendants prohibit any noise that can be heard 25 feet away. Id. at ¶ 36.
 
 
 27
 Deegan commenced this civil rights action on October 6, 2000. He asserted a single cause of action under the First and Fourteenth Amendments alleging violations of his rights to freedoms of association and assembly, free exercise of religion and equal protection. Following discovery, the District Court denied the parties' cross motions for summary judgment.
 
 
 28
 Thereafter, the parties stipulated that the foregoing facts and the testimony of Deegan's noise expert would constitute the entire trial record upon which the District Court would dispose of the case. Deegan v. City of Ithaca, No. 5:00-CV-1531, 2004 WL 1784347, *3 (N.D.N.Y. Aug.10, 2004). The District Judge qualified Thomas S. Katra as an expert in noise and noise measurement and adopted Katra's factual findings as follows:
 
 
 29
 [T]he Court finds that Katra made his measurements in February at the same place and time of day as the October 9, 1999 incident in issue; that 56 decibels was the maximum noise level at which a person could speak and still be in compliance with the ordinance 50 percent of the time; that this decibel level is lower than that generated by the clicking of high-heeled boots, conversations between two or three people, a shop door opening and closing, a small child playing on a playground and a cellular telephone; that most normal human activity would be clearly audible at a distance of 25 feet; and that a spirited conversation between two people would be clearly audible at a distance of 25 feet. The Court further finds that there is no evidence regarding how many people were in "close proximity" (six to eight feet) of plaintiff while he was preaching; that Katra did not measure the decibel level of plaintiff's preaching; that the duration of a loud sound is an important factor in whether it is annoying or alarming; and that factors such as annoyance and alarm cannot be scientifically measured.
 
 
 30
 Id. at *4. The District Court did not adopt Katra's opinions and expressly rejected the opinion that under the conditions at Ithaca Commons, Deegan's "`mode of communication, that being preaching, [cannot] comply with the 25-foot restriction.'" Id. at *3. Noting that the parties stipulated to define "preaching" as "`speech that can be heard beyond twenty-five feet,'" the District Court reasoned that "proof that plaintiff cannot `preach' is not proof that he cannot reasonably make his message heard." Id. at *4. The District Court found no evidence to support a conclusion that Deegan's speech must be heard from more than 25 feet away in order to communicate his religious message. Id. at *6. The District Court also expressly rejected Katra's opinion that the subject ordinance is incompatible with Ithaca Commons, finding the opinion unsupported, unexplained and irrelevant because "`compatibility' was not an issue here." Id. at *4.
 
 
 31
 The District Court determined that Deegan failed to carry his burden to establish that the noise ordinance "violate[d] the First Amendment requirements of content-neutrality, narrow tailoring or alternative channels of communication" and that he did not demonstrate that "the ordinance was selectively enforced against him in violation of the Equal Protection [C]lause." Id. at *7. Accordingly, the District Court entered judgment in favor of the defendants, and Deegan appealed.
 
 
 DISCUSSION
 
 
 32
 As written, the City of Ithaca Noise Ordinance and the Ithaca Commons Amplified Sound Rule do not necessarily raise constitutional concern. The Noise Ordinance identifies twelve nonexclusive factors to be considered in determining whether noise is "unreasonable." None of the factors is weighted. The Amplified Sound Rule prohibits, in the absence of a special permit, amplification "in a loud, annoying or offensive manner such that noise from the device interferes with conversation or with the comfort, repose, health or safety of others within any building or at a distance of 25 feet or greater." With regard to application of the ordinances, the parties stipulated as follows:
 
 
 33
 The City of Ithaca, City Attorney for City of Ithaca [sic], and the City of Ithaca police department, interpret, construe, and enforce the City of Ithaca and Ithaca Commons noise ordinances, specifically sections 240-4 and 157-18, to prohibit any noise that can be heard 25 feet away. This prohibition applies to any type of noise, including speech, whether the noise is amplified or unamplified and whether in Ithaca Commons or in the city.
 
 
 34
 Joint Stipulation ¶ 36. In other words, as applied by the City and its enforcement authorities, the statutory considerations for determining whether noise is excessive or unreasonable are displaced by a bright line rule restricting any noise — anywhere in the city at any time of the day or night — if it "can be heard 25 feet away." Id. (emphasis added). The ordinances do not on their face suggest such an application. Applied as they are, however, the ordinances cannot survive constitutional review.
 
 
 35
 On appeal, Defendants argue repeatedly that noise regulations require consideration of the twelve factors set forth in Section 240-4 in the context of the location in which the noise is generated. Although such a multi-factor reasonableness determination certainly is indicated by the statutory text, Defendants cannot escape their stipulated representation that the standard does not, in practice, guide their interpretation, construction, and enforcement of the regulations. Accordingly, the undisputed fact to which we apply the relevant constitutional standard is that noise that is audible at a distance of 25 feet is illegal in the City of Ithaca.
 
 A. Standard of review
 
 36
 As noted above, the material facts in this case are not in dispute. We analyze the District Court's application of the law to those facts de novo. See Mobil Shipping and Transp. Co. v. Wonsild Liquid Carriers, Ltd., 190 F.3d 64, 67 (2d Cir. 1999). A challenge to the constitutional validity of a local ordinance presents a question of law. See Ramos v. Town of Vernon, 353 F.3d 171, 174 (2d Cir.2003).
 
 B. First Amendment considerations
 
 37
 "[I]n Anglo-American history, at least, government suppression of speech has so commonly been directed precisely at religious speech that a free-speech clause without religion would be Hamlet without the prince." Capitol Square Review and Advisory Bd. v. Pinette, 515 U.S. 753, 760, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995). Deegan's religious speech is fully protected by the First Amendment, applicable to the states through the Fourteenth Amendment, and Defendants do not assert otherwise. See id.; U.S. CONST. amends. I and XIV. As we recently reiterated, "The government's authority to regulate speech or expressive conduct on property that has traditionally been open to the public for such activity, such as public streets and parks, is sharply circumscribed." Hobbs v. County of Westchester, 397 F.3d 133, 148 (2d Cir.2005) (citations omitted).
 
 1. Forum analysis
 
 38
 Defendants argue that Ithaca Commons "is not a public forum in the literal or true sense of that term" and the proximity of residences should be considered when evaluating restrictions on speech. The record, however, clearly establishes that the Commons is a classic public forum, as the term has developed in First Amendment jurisprudence, because it is the type of area traditionally available for public expression and the free exchange of ideas. See Hotel Employees & Restaurant Employees Union v. City of New York Dep't of Parks and Recreation, 311 F.3d 534, 544 (2d Cir.2002). The Ithaca Commons Rules expressly provide that the purpose of the enactment is "to promote the general welfare and public use of the area." Municipal Code of the City of Ithaca § 157-2. A plaque in the Commons, which the parties describe as "commemorating and stating the purpose for Ithaca Commons," proclaims that the area is "dedicated to the citizens of Ithaca as a public gathering place, commercial center and community focal point."
 
 
 39
 Significantly, the Commons is used routinely for a wide array of community, educational, performing and other expressive events and activities. See Hotel Employees Union, 311 F.3d at 547 (noting that the primary factor in determining whether property is a public form is its use). This quality makes Ithaca Commons the type of area that has been described as a "prototypical" or "quintessential" public forum. See, e.g. Schenck v. Pro-Choice Network of Western New York, 519 U.S. 357, 377, 117 S.Ct. 855, 137 L.Ed.2d 1 (1997) (public sidewalks that are associated with free exercise of expressive activities are the "prototypical example of a traditional public forum"); Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983) (noting that streets and parks "have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions") (internal quotation marks and citation omitted).
 
 2. Regulating expression in a public forum
 
 40
 "Speech finds its greatest protection in traditional public fora" like Ithaca Commons. See Make The Road By Walking, Inc. v. Turner, 378 F.3d 133, 142 (2d Cir.2004). "Even in a public forum, [however,] the government may impose reasonable restrictions on the time, place, or manner of protected speech," and the Supreme Court has articulated a three part test to determine whether such restrictions interfere with rights guaranteed by the First Amendment. Ward v. Rock Against Racism, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). To withstand constitutional scrutiny, government restrictions must be (1) content neutral, in that they target some quality other than substantive expression; (2) narrowly tailored to serve a significant governmental interest; and (3) permit alternative channels for expression. Id. This standard is commonly referred to as intermediate scrutiny. See, e.g., Mastrovincenzo v. City of New York, 435 F.3d 78, 98 (2d Cir.2006) (noting that "we apply `intermediate scrutiny' to regulations of expressive activity that are not based on content").
 
 
 41
 "In a First Amendment challenge, the government bears the burden of showing that its restriction of speech is justified under the traditional `narrowly tailored' test." United States v. Doe, 968 F.2d 86, 90 (D.C.Cir.1992). The entity that enacted a challenged regulation has the burden to demonstrate that the interest served justifies the restriction imposed. See Eastern Connecticut Citizens Action Group v. Powers, 723 F.2d 1050, 1052 (2d Cir.1983). The District Court erred when it assigned the burden to Deegan. See Deegan, 2004 WL 1784347 at *6. Determining whether Ithaca's noise regulations accord with the Constitution involves a fact specific and situation specific inquiry. Grayned v. City of Rockford, 408 U.S. 104, 116-17, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). In that regard,
 
 
 42
 [t]he nature of a place, "the pattern of its normal activities, dictate the kinds of regulations of time, place, and manner that are reasonable." Although a silent vigil may not unduly interfere with a public library, making a speech in the reading room almost certainly would. That same speech should be perfectly appropriate in a park. The crucial question is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time.
 
 
 43
 Id. at 116, 92 S.Ct. 2294 (citations omitted).
 
 
 44
 3. Balancing the City's legitimate interests with Deegan's constitutional rights
 
 
 45
 The parties agree that the subject noise ordinances restrict the volume of speech and not its content. The battle lines in this case are thus drawn around Ward's second and third considerations.
 
 
 46
 The City has articulated its objective in regulating noise in the following statement:
 
 
 47
 The purpose of this chapter is to preserve the public health, peace, welfare and good order by suppressing the making, creation or maintenance of excessive, unnecessary, unnatural or unusually loud noises which are prolonged, unusual and unnatural in their time, place and use and which are detrimental to the environment. It is also the purpose of this chapter to allow all residents of the City to coexist harmoniously in a manner which is mutually respectful of the interests, rights and obligations of all persons.
 
 
 48
 City of Ithaca Municipal Code § 240-2. Ithaca has a legitimate interest in keeping sound from reaching a level that is unreasonably "injurious or annoying or disturbing" in furtherance of what the parties describe as the City's concern for "the comfort, repose, health and safety of anyone within its geographical limits." See Carew-Reid v. Metropolitan Transp. Auth., 903 F.2d 914, 917 (2d Cir.1990) ("The elimination of excessive noise is a substantial and laudable goal."). To withstand intermediate scrutiny in this case, the content-neutral means of furthering the City's interest in protecting its citizens from unreasonable noise must avoid unnecessary intrusion on Deegan's freedom of expression. See Ward at 788-89, 109 S.Ct. 2746. The "narrowly tailored" standard does not tolerate a time, place, or manner regulation that may burden substantially more speech than necessary to achieve its goal, nor does it require that the least restrictive alternative available be used. Id.
 
 
 49
 By targeting noise that is "unreasonable," Ithaca's noise regulations evince an intent to reach noise that exceeds what is usual and customary in a particular setting. The stipulated facts reflect that in addition to being a commercial center, the Commons is used regularly for festivals, performing events, exhibitions, political demonstrations, and recreational activities. These are not quiet pursuits that require a quiet atmosphere.
 
 
 50
 Defendants interpret "unreasonable noise" as sound that "can be heard" 25 feet from its source. Construed in this broad manner, the regulatory proscriptions of the Noise Ordinance and the Sound Amplification Rule embrace not only Deegan's protected speech, but the sounds that typify the Commons and the activities it is meant to facilitate. For example, the expert's factual findings, adopted by the District Court, show that the decibel level of speech that would comply with the 25 foot rule was often lower than the decibel level generated by the foot steps of a person in high heeled boots, conversation among several people, the opening and closing of a door, the sounds of a small child playing on the playground, or the ring of a cell phone. Deegan, 2004 WL 1784347, at *3. These facts so vividly illustrate that the regulations as applied restrict considerably more than is necessary to eliminate excessive noise that we need hardly say more. Quite simply, a noise regulation that prohibits "most normal human activity," including a spirited conversation by only two people, is not narrowly tailored to serve the City's interest in maintaining a reasonable level of sound, at least in a public forum like the Commons.
 
 
 51
 Our conclusion is consistent with those of other courts assessing the constitutional validity of similar noise ordinances under the second prong of the Ward test. The D.C. Circuit ruled that a federal national parks regulation prohibiting sounds from "audio devices" generating a higher than prescribed decibel level was not a permissible time, place, and manner restriction. Doe, 968 F.2d at 86. The Doe plaintiff, who participated in a political protest in Lafayette Park in Washington D.C., received several warnings and subsequently was arrested by the park police because her drum beating exceeded a noise level of 60 decibels at 50 feet. Id. at 87 (citing 36 C.F.R. 2.12(a)(1)(i) (1991)). Recognizing the government's interest in maintaining a tranquil atmosphere in national parks located in wilderness settings, the D.C. Circuit distinguished the level of quiet that could be legitimately justified in a public forum like Lafayette Park, which is a "primary assembly point for First Amendment activity aimed at influencing national policy" and is "exposed to every form of urban commotion." Id. 88-89. On a record that demonstrated that background music, a loud conversation, and even the electric generators operating in Lafayette Park on the day of the plaintiff's arrest would exceed the regulatory standard, the court concluded that the restriction was not "`narrowly tailored to promote the government's interest in maintaining an appropriate level of sound volume in a traditional public forum park during a permitted demonstration." Id. at 90-91; see also Reeves v. McConn, 631 F.2d 377, 388 (5th Cir. 1980) (striking down parts of Houston's amplified sound restriction as not sufficiently precise to protect only the city's legitimate interest in prohibiting conduct that (i) leads to "material and substantial disruption of the community or invasions of the rights of others" or (ii) is "clearly incompatible with the normal activity of certain locations and certain times"); United States Labor Party v. Pomerleau, 557 F.2d 410, 413 (4th Cir.1977) (finding unconstitutional a Baltimore noise ordinance that "curtails the amplification of political expression solely because the number of decibels, as measured within a few feet of the speaker, exceeds the permissible sound level"); Lilly v. City of Salida, 192 F.Supp.2d 1191, 1194 (D.Col. 2002) (rule banning amplified sound that is audible within 25 feet of property line constitutes complete ban on use of amplification for any speech and as such is not a reasonable time, place or manner restriction, nor is it narrowly tailored to protect against excess noise).
 
 
 52
 Similarly, Defendants cannot justify their even stricter regulation of Deegan's speech in the Commons, which is a public forum bustling with the sounds of recreation, celebration, commerce, demonstration, rallies, music, poetry, speeches, and other expressive undertakings. Nor does the record demonstrate that Deegan's preaching is incompatible with these activities. Taking into account the "nature and purposes of the [Commons], along with its ambient characteristics," Doe, 968 F.2d at 91, we hold that the City of Ithaca Municipal Code Sections 240-4 and 157-18, as interpreted and applied by Defendants, unreasonably burden protected speech and therefore cannot withstand Deegan's constitutional challenge.
 
 
 53
 Because we find that the challenged ordinances as applied by the Defendants are not narrowly tailored to serve their objectives, we do not reach the third prong of the Ward test, which requires that content-neutral restrictions permit adequate alternative channels for expression. See Ward, 491 U.S. at 791, 109 S.Ct. 2746.
 
 C. Fourteenth Amendment considerations
 1. Fair notice
 
 54
 In an argument not raised prior to this appeal, Deegan asserts that he did not have sufficient notice of the conduct that was prohibited by Ithaca's noise regulations. Generally, we consider addressing arguments raised for the first time on appeal as imprudent, even though there is no jurisdictional bar to doing so. See, e.g., Sniado v. Bank Austria AG, 378 F.3d 210, 213 (2d Cir.2004). Although "[e]quitable factors do not weigh heavily in favor of discretionary review of a belated argument" like Deegan's, which could have been raised to the District Court, we will exercise our discretion to review its merits because the question presented "is purely legal and requires no further development of the record." Id. "The Due Process Clause requires that laws be crafted with sufficient clarity to `give the person of ordinary intelligence a reasonable opportunity to know what is prohibited,' and to `provide explicit standards for those who apply them.'" General Media Commc'ns v. Cohen, 131 F.3d 273, 286 (2d Cir.1997) (quoting Grayned, 408 U.S. at 108, 92 S.Ct. 2294). As we have previously observed, the due process concern is "whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." United States v. Roberts, 363 F.3d 118, 123 (2d Cir.2004) (citation omitted).
 
 
 55
 Neither the Noise Ordinance nor the Amplified Sound Rule expressly prohibit any noise that can be heard 25 feet away. The Noise Ordinance prohibits "unreasonable noise," which is defined as "any sound . . . which either annoys, disturbs, injures or endangers the comfort, repose, health, peace or safety of the public or which causes injury to animal life or damages to property or business" based on analysis of twelve factors addressing the particular circumstance presented. We have upheld similarly worded noise restrictions as sufficiently clear to withstand vagueness challenges. See, e.g., Howard Opera House v. Urban Outfitters, 322 F.3d 125, 128 (2d Cir.2003) (due process notice requirement satisfied in statute prohibiting "loud or unreasonable noise" defined as that which "disturbs, injures or endangers the peace or health of another or . . . endangers the health, safety or welfare of the community") (internal quotation marks and citation omitted); Pro-Choice Network v. Schenck, 67 F.3d 359, 373 (2d Cir.1994) (statute defining "excessively loud sound" as one that "injures, disturbs, or endangers . . . health or safety" is not impermissibly vague). Although those decisions would foreclose a due process challenge to the articulation of "unreasonable noise" in the Noise Ordinance itself, it is clear from the Defendants' stipulations that the statute is enforced based on a single factor not mentioned in the statute.
 
 
 56
 Similarly, Ithaca's Amplified Sound Rule does not ban noise that "can be heard 25 feet away." Rather, in the absence of a permit, the statute prohibits "amplification in a loud, annoying or offensive manner such that noise from the device interferes with the conversation or with the comfort, repose, health or safety of others within any building or at a distance of 25 feet or greater." City of Ithaca Municipal Code § 157-18 (emphasis added). Nothing in either ordinance indicates that they are to be applied as bright line proscriptions of any sound that can be heard at a distance of 25 feet from its source, anywhere, at any time.
 
 
 57
 The Ninth Circuit addressed similar circumstances in Chalmers v. City of Los Angeles, 762 F.2d 753 (9th Cir.1985), where a vendor was harassed and threatened with arrest under the authority of two apparently conflicting vending ordinances despite assurances from city officials who she consulted prior to engaging in the sale of t-shirts from a push cart. Affirming judgment in favor of the vendor, the Ninth Circuit observed that the vendor had done all that could be reasonably expected to understand the vending regulations, even seeking clarification and advice from city officials. Id. at 758. In concluding that the ordinances did not "`afford[ ] fair warning of what was proscribed,'" the Ninth Circuit explained, "We do not hold that the ordinance scheme itself was necessarily a violation of due process. Rather, the due process violation occurred in the manner in which this inconsistent scheme was implemented and enforced." Id. at 758.
 
 
 58
 The reasoning of Chalmers applies here. The Ithaca noise regulations indicate that a number of factors are relevant to determining whether a violation has occurred, but they do not give fair notice that speaking in a voice that can be heard at a distance of 25 feet, without more, constitutes "unreasonable noise." Nevertheless, the City has stipulated that reasonableness is determined solely on that basis. Like the vending ordinances in Chalmers, the ordinances at issue in this case do not necessarily violate due process. Rather, it is Defendants' unpredictable construction and application of the ordinance that deprived Deegan of his right to understand what conduct violated the law. The manner in which the Ithaca noise ordinances are enforced makes them constitutionally infirm.
 
 
 59
 Defendants posit that the 25 foot guideline set forth in the Sound Amplification Rule "implicitly applies to excessive unamplified noise as well" and also that the Sound Amplification Rule is enforced in conjunction with the Noise Ordinance reasonableness factors. Neither ordinance refers to the other, but even read together, they do not give notice that "any type of noise, including speech, whether the noise is amplified or unamplified and whether in the Ithaca Commons or in the city" is prohibited if "it can be heard 25 feet away." In that regard, Ithaca's application of its ordinances fails to do what the Constitution requires.
 
 2. Equal protection
 
 60
 The District Court properly denied Deegan's equal protection claim, in which he asserted that he was singled out because the Ithaca noise restrictions are broad and vague. Cf. In re Primus, 436 U.S. 412, 432, 98 S.Ct. 1893, 56 L.Ed.2d 417 (1978) (noting that "broad prophylactic rules in the area of free expression are suspect"). To prove a selective enforcement claim, a plaintiff must demonstrate that laws were not applied to him as they were applied to similarly situated individuals and that the difference was intentional and unreasonable. Village of Willowbrook v. Olech, 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000) (per curiam); Harlen Assocs. v. Inc., Vill. of Mineola, 273 F.3d 494, 499 (2d Cir.2001).
 
 
 61
 The parties stipulated that while Deegan was in Ithaca Commons on October 9, 1999, although he heard people talking who were beyond 25 feet from him and heard a singing group from a distance of approximately 200 feet, everyone other than Deegan and his companions were left undisturbed. These facts in the record, however, do not establish that Deegan was similarly situated to the people he claimed to hear. For example, the parties' stipulation expressly states that there is no record of complaints about anyone but Deegan; similarly, there is nothing to indicate whether the singers may have had a permit under the Sound Amplification Rule. Because on the stipulated facts Deegan cannot establish an essential element of his claim that the noise regulations were enforced selectively against him, he cannot prevail on an equal protection theory.
 
 
 CONCLUSION
 
 
 62
 Having determined that Sections 240-4 and 157-18 of the City of Ithaca Municipal Code, as construed, applied, and enforced by Defendants violated Deegan's First Amendment rights and failed to provide him fair notice of the conduct they proscribe, we conclude that the District Court erred by entering judgment in favor of Defendants and that Deegan is entitled to judgment as a matter of law. Accordingly, we reverse the judgment issued by the District Court and remand the case for entry of judgment in favor of Deegan and for a determination and award of the appropriate relief.
 
 
 
 Notes:
 
 
 *
 The Hon. Frederick J. Scullin, Jr., Chief Judge of the United States District Court for the Northern District of New York, sitting by designation