10-4355-cv
Marcavage v. City of New York

## UNITED STATES COURT OF APPEALS

### FOR THE SECOND CIRCUIT

August Term, 2011

(Argued: January 24, 2012      Decided: August 2, 2012)

Docket No. 10-4355-cv

- - - - - - - - - - - - - - - - - - - - - - - -x

**MICHAEL MARCAVAGE, STEVEN C. LEFEMINE,**

**<u>PLAINTIFFS-APPELLANTS</u>,**

**-v.-**

**THE CITY OF NEW YORK, RAYMOND KELLY, in his individual and official capacity as the Commissioner of the New York City Police Department, SERGEANT EBANKS, CAPTAIN STAPLES, OFFICER DONNELLY, AS YET UNKNOWN OFFICERS, in their individual capacities and official capacities as Police Officers for the New York Police Department,**

**<u>DEFENDANTS-APPELLEES</u>.**

- - - - - - - - - - - - - - - - - - - - - - - -x


Before:        JACOBS, <u>Chief Judge</u>, LEVAL and
               LIVINGSTON, <u>Circuit Judges</u>.

Plaintiffs, two protesters at the 2004 Republican National Convention at Madison Square Garden, were arrested after they failed to comply with police instructions to move from an area where demonstrating was prohibited to one designated for protesting. They brought the present action under 42 U.S.C. § 1983, alleging that the policy violated the First Amendment and that their arrest violated the Fourth Amendment and now appeal the judgment of the United States District Court for the Southern District of New York (Sullivan, J.) granting summary judgment in favor of the defendants. We conclude that the restriction on speech was a reasonable time, place, and manner restriction, and that Plaintiffs' arrest was supported by probable cause.

Affirmed.

James A. Campbell (Jeffrey A. Shafer, Brian W. Raum, on the briefs), Alliance Defense Fund, for Plaintiffs-Appellants.

Drake A. Colley (Edward F.X. Hart, on the brief), for Michael A. Cardozo, Corporation Counsel of the City of New York, for Defendants-Appellees.

DENNIS JACOBS, Chief Judge:

Michael Marcavage and Steven Lefemine ("Plaintiffs"), protesters at the 2004 Republican National Convention at Madison Square Garden, were arrested after they failed to

2

comply with police instructions to move along from an area where demonstrating was prohibited and to one designated for protesting.  They brought this suit under 42 U.S.C. § 1983 against the New York City Police Department ("NYPD"), the Police Commissioner, three NYPD officers, and others (collectively, "Defendants"), seeking declaratory and injunctive relief as well as money damages.  Plaintiffs claim the NYPD's policy around the convention violated the First Amendment and that Plaintiffs' arrest violated the Fourth Amendment.  This appeal is taken from a judgment of the United States District Court for the Southern District of New York (Sullivan, J.) granting summary judgment in favor of Defendants.  We conclude that the restriction on speech was a reasonable time, place, and manner restriction, and that the arrests were supported by probable cause.

### BACKGROUND

**The Convention.**  The 2004 Republican National Convention ("the Convention") was held from August 30 to September 2 at Madison Square Garden ("the Garden") in midtown Manhattan.  The security planners of the NYPD understood that political conventions are potential terrorist targets and therefore prepared for the possibility

that groups and individuals would engage in criminal conduct that could significantly endanger public safety. The NYPD was also responsible for accommodating commuters, businesses, and residents in the vicinity. As many as 50,000 people were expected to attend the four-day Convention. The NYPD anticipated that there would be a volume of protest activity not seen in New York City in decades, including potentially hundreds of thousands of protesters throughout the city.

The Garden sits atop Pennsylvania Station ("Penn Station"), one of the transportation hubs of New York City. Approximately 1,300 trains and 600,000 riders pass through Penn Station each day. The vicinity is ordinarily congested by vehicular and pedestrian traffic; a major event at the Garden can bring thousands of additional pedestrians.

The complex is a superblock bordered by Seventh and Eighth Avenues to the east and west, and by 31st and 33rd Streets to the south and north. During the Convention, Seventh Avenue was closed to non-emergency vehicle traffic from 31st Street to 34th Street. The crosswalk at Seventh Avenue and 32nd Street was open to pedestrians, who could use it without waiting for non-emergency traffic.

The NYPD implemented a three-zone system outside the Garden: a demonstration area, a frozen area (with no pedestrian traffic), and a no-demonstration area.

In the "frozen zone"--the Seventh Avenue sidewalk adjacent to the Garden between 31st and 33rd Streets-- barriers were erected and all pedestrian traffic was prohibited.

Directly across Seventh Avenue from the frozen zone was the "no-demonstration" zone between 31st and 33rd Streets. People on that east sidewalk were not permitted to protest, distribute leaflets, or congregate in that area, even if they remained in motion and kept up with the flow of pedestrian traffic.[1] NYPD officers advised people in the

---

[1] Defendants contend that the zone was actually a no-standing zone, where people were not permitted to stand still or congregate but where they could engage in expressive activity, such as protesting, so long as they kept up with the flow of traffic and did not congregate in groups. However, Plaintiffs adduced testimony from NYPD officials that people in this zone were not permitted to demonstrate or distribute leaflets, even if they remained in motion and kept up with the flow of pedestrian traffic. Because this case comes to us on appeal from the grant of summary judgment for Defendants, we must view the evidence in the light most favorable to the non-moving party (here, Plaintiffs). Terry v. Ashcroft, 336 F.3d 128, 137 (2d Cir. 2003). Accordingly, we must credit Plaintiffs' evidence and accept, as the district court did, that the zone along the east side of Seventh Avenue was a no-demonstration zone--not a no-standing zone. See Marcavage v. City of New York, No. 05 Civ. 4949(RJS), 2010 WL 3910355, at *5 (S.D.N.Y. Sept. 29, 2010).

5

vicinity of the Garden to go to the demonstration zone if they wanted to protest.

The "demonstration zone" was the full width of Eighth Avenue, extending south from 31st Street. Within the demonstration zone, expressive activity was permitted at any time during the Convention. The NYPD issued sound permits and constructed a stage for demonstrators at the north end of the demonstration area, near the 31st Street intersection, closest to the Garden. Thousands of protesters used the demonstration area.

**The Protest.** On September 1, 2004, Plaintiffs were standing in the no-demonstration zone between 32nd and 33rd Streets, holding anti-abortion signs--one sign was four by six feet, the other was three by five. Plaintiffs were approximately five feet from the facade of the Pennsylvania Hotel, where (they contend) they were outside the flow of pedestrian traffic. After 10 to 15 minutes, they were approached by police officers.

The officers repeatedly told Plaintiffs they could not protest there, and directed them to the demonstration zone. Plaintiffs objected that the demonstration zone was not within sight and sound of the Convention attendees and that they did not want to be in the demonstration zone lumped with other demonstrators. At some point during the

6

encounter, Plaintiffs moved to the south side of 32nd Street, in the general direction of the demonstration zone (which was south and west of the initial location). But Plaintiffs continued to contest the officers' commands. All told, Plaintiffs were ordered to leave 17 times by three different police officers before they were informed that they were blocking traffic and placed under arrest.

Marcavage and Lefemine were charged with disorderly conduct, and Marcavage was also charged with resisting arrest. All charges against Marcavage were ultimately dismissed. Lefemine accepted an adjournment in contemplation of dismissal for his charge of disorderly conduct. The charge was ultimately dismissed.

**The Proceedings.** Plaintiffs brought the present action under § 1983 alleging violations of the First and Fourth Amendments and seeking money damages and equitable relief. The district court granted summary judgment for Defendants, holding that the NYPD's policy was a permissible time, place, and manner restriction on expression, and that probable cause supported Plaintiffs' arrest. Marcavage v. City of New York, No. 05 Civ. 4949(RJS), 2010 WL 3910355 (S.D.N.Y. Sept. 29, 2010). Plaintiffs filed this appeal.

7

**DISCUSSION**

We review the grant of summary judgment de novo. Miller v. Wolpoff & Abramson, L.L.P., 321 F.3d 292, 300 (2d Cir. 2003). Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Id. In assessing a motion for summary judgment, we are "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment [was granted]." Terry v. Ashcroft, 336 F.3d 128, 137 (2d Cir. 2003) (internal quotation marks omitted).

**I**

A question has arisen as to this Court's jurisdiction to consider the claims for declaratory and injunctive relief.

Article III limits the subject matter jurisdiction of federal courts to actual "cases" or "controversies," U.S. Const. art. III, § 2, cl. 1; accord Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180 (2000), which requires, among other things, that a plaintiff sustain the burden of establishing standing, Raines v. Byrd, 521 U.S. 811, 818-19 (1997); Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 37-38 (1976).

8

Plaintiffs lack standing to pursue their equitable claims. To obtain *prospective* relief, such as a declaratory judgment or an injunction, a plaintiff must show, <u>inter alia</u>, "a sufficient likelihood that he [or she] will again be wronged in a similar way." <u>City of Los Angeles v. Lyons</u>, 461 U.S. 95, 111 (1983). That is, a plaintiff must demonstrate a "certainly impending" future injury. <u>Whitmore v. Arkansas</u>, 495 U.S. 149, 158 (1990) (internal quotation marks omitted); <u>accord</u> <u>O'Shea v. Littleton</u>, 414 U.S. 488, 496 (1974). In establishing a certainly impending future injury, a plaintiff cannot rely solely on past injuries; rather, the plaintiff must establish how he or she will be injured prospectively and that the injury would be prevented by the equitable relief sought. <u>Whitmore</u>, 495 U.S. at 158-59; <u>Lyons</u>, 461 U.S. at 102-03; <u>O'Shea</u>, 414 U.S. at 495-96.

Neither party's national convention will be in New York City in 2012, and there is no prospect that a national convention will be coming anytime to the Garden, or that, if one did, similar policies regarding pedestrian traffic and protesters would be enacted or enforced. Since Plaintiffs have not demonstrated a certainly impending future injury that could be redressed by this Court, we lack jurisdiction to adjudicate their claims for equitable relief.

Standing to seek *retrospective* relief, such as damages, requires a showing that [1] the plaintiff suffered an injury in fact that is concrete and not conjectural or hypothetical, [2] the injury is fairly traceable to the actions of the defendant, and [3] the injury will be redressed by a favorable decision.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).  Plaintiffs make the requisite showing as to their claim for damages.

Because we have jurisdiction over the claims for money damages, we turn to them now.


                                II

Plaintiffs contend that the no-demonstration zone along Seventh Avenue was an unreasonable time, place, and manner restriction, and therefore violated the First Amendment.

Preliminarily, we consider [1] whether Plaintiffs were engaged in First Amendment protected activity [2] in a traditional public forum, and [3] if the restriction on speech was unrelated to content.  See Ward v. Rock Against Racism, 491 U.S. 781, 790-91 (1989).

First, Plaintiffs' display of a political sign constituted political speech, which "is entitled to the fullest possible measure of constitutional protection."  See Members of the City Council v. Taxpayers for Vincent, 466

U.S. 789, 816 (1984); see also Frisby v. Schultz, 487 U.S. 474, 479 (1988) (peacefully picketing); United States v. Grace, 461 U.S. 171, 176 (1983) (peacefully displaying signs or leaflets).

Second, Plaintiffs were carrying out their expressive activity in a traditional public forum. "Sidewalks, of course, are among those areas of public property that traditionally have been held open to the public for expressive activities," Grace, 461 U.S. at 179; accord Frisby, 487 U.S. at 480, and the sidewalks of New York are the "prototypical" traditional public forum, Schenck v. Pro-Choice Network of W. N.Y., 519 U.S. 357, 377 (1997); accord Loper v. N.Y.C. Police Dep't, 999 F.2d 699, 704 (2d Cir. 1993). "Speech finds its greatest protection in traditional public fora," Make the Road by Walking, Inc. v. Turner, 378 F.3d 133, 142 (2d Cir. 2004)--though even there the right is "not absolute," United for Peace & Justice v. City of New York, 323 F.3d 175, 176 (2d Cir. 2003) (per curiam).

Third, as Plaintiffs concede, the restraint on expressive activity was content neutral. **Blue Br. at 26.** This concession is well-taken. A regulation is content neutral when it is "justified without reference to the content of the regulated speech." City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 48 (1986) (emphasis

11

and internal quotation mark omitted).  The restriction on expressive activity was not aimed at the content of the message; no demonstrating of any kind was allowed in that zone.

Since Plaintiffs were engaged in expressive activity in a public forum and the regulation was content neutral, the restriction on speech near the Convention is properly characterized as a time, place, and manner restriction. Such restrictions are permissible if they "'[1] are justified without reference to the content of the regulated speech, [2] . . . are narrowly tailored to serve a significant governmental interest, and [3] . . . leave open ample alternative channels for communication of the information.'"  Ward, 491 U.S. at 791 (quoting Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288, 293 (1984)). Defendants bear the burden of demonstrating that the regulation was constitutional.  United States v. Playboy Entm't Grp., Inc., 529 U.S. 803, 816-17 (2000); Deegan v. City of Ithaca, 444 F.3d 135, 142 (2d Cir. 2006).

Since the restriction was content neutral, the decisive issues are narrow tailoring and alternative channels.

12

**A**

Whether the NYPD's policy was narrowly tailored to serve a significant government interest depends on the importance of the government's interest and the breadth of the speech restriction.

**1**

Government "certainly has a significant interest in keeping its public spaces safe and free of congestion." Bery v. City of New York, 97 F.3d 689, 697 (2d Cir. 1996); accord Mastrovincenzo v. City of New York, 435 F.3d 78, 100 (2d Cir. 2006) ("[R]educing sidewalk and street congestion in a city with eight million inhabitants[] constitute[s] [a] significant governmental interest[] . . . .") (internal quotation marks omitted). And "there can be no doubting the substantial government interest in the maintenance of security at political conventions." Bl(a)ck Tea Soc'y v. City of Boston, 378 F.3d 8, 12 (1st Cir. 2004).

Plaintiffs contend that Defendants adduced insufficient evidence to support these interests and instead relied on unspecific, generic security rationales.

The record amply establishes non-security reasons for banning protesters from occupying a crowded sidewalk. The considerable interests of the "millions of residents,

13

visitors, and workers must be balanced" against the interest of protesters.  See Concerned Jewish Youth v. McGuire, 621 F.2d 471, 478 (2d Cir. 1980); see also Mastrovincenzo, 435 F.3d at 100.  The stretch of Seventh Avenue in front of the Garden is a crowded thoroughfare even without major sports or political events at the Garden, with commuters, shoppers, tourists, residents, and other people passing through.  The freezing of the western sidewalk channeled all those pedestrians to the one side designated a no-demonstration zone.  The City had the requisite significant interest in keeping that channel clear for pedestrians.

The government interest in security is also significant.  In the Fourth Amendment context, we have held that "no express threat or special imminence is required before we may accord great weight to the government's interest in staving off considerable harm."  MacWade v. Kelly, 460 F.3d 260, 272 (2d Cir. 2006).  "All that is required is that the 'risk to public safety [be] substantial and real' instead of merely 'symbolic.'"  Id. (brackets in original) (quoting Chandler v. Miller, 520 U.S. 305, 322-23 (1997)).  These principles also apply in the First Amendment context.  Because "security protocols exist to deal with hypothetical risks"--and "security planning is necessarily concerned with managing potential risks,

14

which sometimes necessitates consideration of the worst-case scenario"--it is "appropriate" for governments to consider possible security threats and the role that protesters may play in causing such threats or inadvertently preventing the authorities from thwarting or responding to such threats. Citizens for Peace in Space v. City of Colo. Springs, 477 F.3d 1212, 1223-24 (10th Cir. 2007). "As long as a designed security protocol reduces a plausible and substantial safety risk, it directly and effectively advances a substantial government interest." Id. at 1224; see also Bl(a)ck Tea Soc'y, 378 F.3d at 13 ("[T]he government's judgment as to the best means for achieving its legitimate objectives deserves considerable respect." (citing Ward, 491 U.S. at 798-99)).

The police had to design measures to cope with a security challenge that was altogether extraordinary. The Convention was in the middle of New York City, adjacent to Penn Station. Fifty thousand attendees were expected for the Convention itself. Protesters of different persuasions would descend. Vehicle and pedestrian traffic would be re-routed along two main arteries. The national conventions that year were the first following the 2001 terror attacks. The President was coming, as well as the Vice President and a host of other government officials. These facts, taken

15

together, bespeak a significant--indeed, compelling-- government interest in security.

**2**

The Government must also show that its policy was "narrowly tailored" to achieve that significant government interest.  Ward, 491 U.S. at 791.

A regulation is narrowly tailored "'so long as [it] . . . promotes a substantial government interest that would be achieved less effectively absent the regulation,'" and is "not substantially broader than necessary to achieve the government's interest."  Id. at 799-800 (quoting United States v. Albertini, 472 U.S. 675, 689 (1985)); accord Deegan, 444 F.3d at 143 ("The 'narrowly tailored' standard does not tolerate a time, place, or manner regulation that may burden substantially more speech than necessary to achieve its goal . . . .").

The no-demonstration zone was narrowly tailored to achieve significant government interests.  The restricted zones were confined to a two-block stretch of Seventh Avenue and were in place only during the four days of the Convention.  And the policy was tailored to meet the congestion and security challenges that the Convention presented.  The frozen zone was limited to the sidewalk

16

immediately in front of a single side of the Garden.  The no-demonstration zone was limited to the opposite sidewalk, which had to be kept unobstructed to accommodate the heavy pedestrian traffic that usually occupies both sides.  These facts therefore distinguish this case from United States v. Grace, 461 U.S. 171 (1983), and Lederman v. United States, 291 F.3d 36 (D.C. Cir. 2002), which both considered year-round prohibitions on sidewalk demonstrations in places without the dense crowds of protesters and pedestrians that beset the holding of the Republican National Convention in the middle of Manhattan.

Plaintiffs argue that the no-demonstration zone was not narrowly tailored because protesters were barred even from forms of expression that did not increase congestion, such as carrying a sign while keeping up with the flow, or standing to one side.  It may be, as Plaintiffs suggest, that a no-standing zone or no-large-sign zone would have been a less restrictive alternative, but "narrowly tailored" does not mean the "least restrictive or least intrusive means."  Ward, 491 U.S. at 798.  "[R]estrictions on the time, place, or manner of protected speech are not invalid 'simply because there is some imaginable alternative that might be less burdensome on speech.'"  Id. at 797 (quoting Albertini, 472 U.S. at 689); accord id. at 800 ("[T]he

17

regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative."). A regulation is narrowly tailored "so long as [it] . . . promotes a substantial government interest that would be achieved less effectively absent the regulation" and is "not substantially broader than necessary." Id. at 799-800 (internal quotation marks omitted).

The no-demonstration zone does not burden *substantially* more speech than necessary, even if alternatives are conceivable. Even if protesters kept walking, they would occlude pedestrian passage, especially when they picketed back and forth. Policing a less than clear-cut regulation also would risk the fact or appearance of selective enforcement based on content, and would result in the "substantial, additional burdens of . . . maintaining supervision of the protestors . . . and generally providing enough manpower in close proximity to the protestors to quickly handle any protest that turned violent." Citizens for Peace in Space, 477 F.3d at 1223.

Plaintiffs argue that the no-demonstration zone was not narrowly tailored because it was a complete ban on demonstrating. But "[a] complete ban can be narrowly tailored" if, as Defendants have shown, "each activity

18

within the proscription's scope is an appropriately targeted evil."  Frisby, 487 U.S. at 485.

Finally, Plaintiffs contend that justifications based on security and congestion are premised on large numbers of protesters whereas Plaintiffs are just two people standing out of the way.  We disagree.  The policy "should not be measured by the disorder that would result from granting an exemption solely to [Plaintiffs]" because if these two plaintiffs were allowed a dispensation, "so too must other groups," which would then create "a much larger threat to the State's interest in crowd control" and security.  See Int'l Soc'y for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 685 (1992).  Plaintiffs' approach would also vest line-level officers with power and discretion to determine when the number of protesters exceeds some unspecified permissible number, whether to aggregate small groups of protesters who may not agree, and to decide which group came first and should be allowed to stay while others must leave.

In short, the NYPD's small no-demonstration zone on a two-block strip of Seventh Avenue was narrowly tailored to address the threats to sidewalk congestion and security created by an event the size and spectacle of a national convention in midtown Manhattan.

**B**

It remains to decide whether the regulation "leave[s] open ample alternative channels for communication of the information." Ward, 491 U.S. at 791 (internal quotation mark omitted).

Although an alternative channel for communication must be available, it is clear that "[t]he First Amendment . . . does not guarantee [protesters] access to every or even the best channels or locations for their expression." Carew-Reid v. Metro. Transp. Auth., 903 F.2d 914, 919 (2d Cir. 1990). "The requirement that 'ample alternative channels' exist does not imply that alternative channels must be perfect substitutes for those channels denied to plaintiffs by the regulation at hand; indeed, were we to interpret the requirement in this way, no alternative channels could ever be deemed 'ample.'" Mastrovincenzo, 435 F.3d at 101; see also Irish Lesbian & Gay Org. v. Giuliani, 918 F. Supp. 732, 744 (S.D.N.Y. 1996) ("Whether ample alternatives are available does not depend on the preference of the speaker for one method or another."). All that is required is that an alternative channel be ample--i.e., an "adequate" channel for communication. Deegan, 444 F.3d at 144.

The alternative channel for communication available for demonstrations at the Convention was a demonstration zone spanning the width of Eighth Avenue, starting at the southwest corner of the Garden, one avenue from the primary entrance to the Garden. The zone was equipped with a stage and sound amplification equipment, which all the protesters (including Plaintiffs) were free to use.

In this Circuit, an alternative channel is adequate and therefore ample if it is within "close proximity" to the intended audience. United for Peace & Justice, 323 F.3d at 177; see Concerned Jewish Youth, 621 F.2d at 472-74, 476-77. In United for Peace & Justice, the city denied a permit to march past the United Nations headquarters and instead granted a permit for a stationary protest at a nearby park-- on the other side of a major avenue, and two blocks north of the entrance to the United Nations. 323 F.3d at 177; see also United for Peace & Justice v. City of New York, 243 F. Supp. 2d 19, 21, 29 (S.D.N.Y. 2003), aff'd 323 F.3d 175 (2d Cir. 2003). Because the protesters were permitted to demonstrate in "close proximity to the United Nations," the restriction on their march comported with the First Amendment. United for Peace & Justice, 323 F.3d at 177; see also Concerned Jewish Youth, 621 F.2d at 472-74, 476-77 (upholding a restriction that prevented protesters from

21

marching in front of the Russian Mission and instead permitted twelve of them to protest in a small area down the street because it provided an ample alternative channel for communication).

Plaintiffs' chief argument on appeal is that the demonstration zone was inadequate because it was not within "sight and sound" of the intended audience, which they identify as the delegates.  Although this may be a relevant consideration in some instances, none of the cases cited by Plaintiffs establishes "sight and sound" as a constitutional requirement.  In each, the protester was within sight and sound of the intended audience, so there was no occasion to say whether sight and sound proximity is a required feature of an adequate alternative channel.  See, e.g., Marcavage v. City of Chicago, 659 F.3d 626, 631 (7th Cir. 2011), Citizens for Peace in Space, 477 F.3d at 1226; Menotti v. City of Seattle, 409 F.3d 1113, 1138 (9th Cir. 2005); Bl(a)ck Tea Soc'y, 378 F.3d at 14.  Accordingly, none could support a holding that sight and sound access is constitutionally compelled.[2]

[2] In Bay Area Peace Navy v. United States, 914 F.2d 1224 (9th Cir. 1990), the protesters were not within sight and sound of the intended audience.  This case is not persuasive.  It is a split decision from another circuit in which the majority held that the speech restriction was not narrowly tailored, so the discussion of "ample alternative channels" was therefore dictum.

Plaintiffs argue that they should have been able to protest at 32nd Street and Seventh Avenue--the primary point of ingress and egress to Penn Station and the Garden. Many, if not all, of the delegates *may* have entered that way. But there are many ways to arrive at the Garden (car, bus, train, foot), and there are different lines of approach along the City's grid.[3] Many delegates may have traveled to the Garden by a route that brought them close to the demonstration zone along Eighth Avenue. In short, Plaintiffs could not have been seen and heard by most of the delegates--let alone all of them--unless demonstrators were allowed to congregate at the main entrance or were admitted to the innards of the Garden, where they had no constitutional right to be, Bl(a)ck Tea Soc'y, 378 F.3d at 14.

Whether an alternative channel is adequate cannot be determined "in an objective vacuum, but instead" requires "practical recognition [of] the facts." Citizens for Peace

---

[3] Plaintiffs contend that the entrance to the Garden at 32nd Street near Seventh Avenue was the only open entrance. This argument is an overreading of the undisputed evidence: "Because of the various closures to ingress and egress to and from Penn Station and [the Garden], . . . the 32nd Street approach to Penn Station and [the Garden] became the *primary point of ingress and egress* to that venue for thousands of pedestrians and commuters." Joint App'x 87 (Decl. of (Retired) NYPD Chief Bruce Smokla, § 16) (emphasis added). Implicit in the designation of one entrance as "primary" is that there are one or more others.

in Space, 477 F.3d at 1226 (internal quotation marks omitted).  Here, the manifold risks ranged from pedestrian gridlock to assassination.  Under such circumstances, a demonstration zone one avenue from the primary entrance to the Garden was an ample alternative channel for protesters, such as Plaintiffs.

* * *

Because the NYPD's limitation on speech around the Convention was content neutral, was narrowly tailored to achieve a substantial government interest, and allowed an ample alternative channel of communication, it was a permissible time, place, and manner restriction on speech. Accordingly, the district court correctly dismissed Plaintiffs' First Amendment claim.

**III**

Both Plaintiffs were arrested for disorderly conduct, and Marcavage was also arrested for resisting arrest. Plaintiffs contend that their arrest violated the Fourth Amendment.  Defendants counter that probable cause existed.

Plaintiffs were arrested without a warrant.  Such an arrest comports with the Fourth Amendment if the officer has "probable cause to believe that a criminal offense has been or is being committed."  Devenpeck v. Alford, 543 U.S. 146,

152 (2004). "Probable cause exists where the facts and circumstances within . . . the officers' knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested." Dunaway v. New York, 442 U.S. 200, 208 n.9 (1979) (internal quotation marks and brackets omitted). A court assessing probable cause must "examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." Maryland v. Pringle, 540 U.S. 366, 371 (2003) (internal quotation marks omitted).

Defendants contend there was probable cause to arrest Plaintiffs for disorderly conduct,[4] obstruction of governmental administration (under New York Penal Law § 195.05[5] and New York City Charter § 435(a)[6]), and failure

---

[4] A person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof: . . . (5) He obstructs vehicular or pedestrian traffic; or (6) He congregates with other persons in a public place and refuses to comply with a lawful order of the police to disperse . . . .

N.Y. Penal Law § 240.20(5)-(6) (McKinney 2010).

[5] A person is guilty of obstructing governmental administration when he intentionally obstructs, impairs or perverts the administration of law or

to comply with lawful orders to disperse. A Fourth Amendment claim turns on whether probable cause existed to arrest for any crime, not whether probable cause existed with respect to each individual charge. See Devenpeck, 543 U.S. at 153-56. Accordingly, Defendants prevail if there was probable cause to arrest Plaintiffs for any single offense. See Jaegly v. Couch, 439 F.3d 149, 154 (2d Cir. 2006).

Probable cause supported the arrests for obstruction of governmental administration. Plaintiffs rejected 17 directives (by three officers) to leave the no-demonstration

---

other governmental function or prevents or attempts to prevent a public servant from performing an official function, by means of intimidation, physical force or interference, or by means of any independently unlawful act . . . .
N.Y. Penal Law § 195.05 (McKinney 2010).

[6] The police department . . . shall have the power and it shall be their duty to preserve the public peace, prevent crime, detect and arrest offenders, suppress riots, mobs and insurrections, disperse unlawful or dangerous assemblages and assemblages which obstruct the free passage of public streets, sidewalks, parks and places; . . . regulate, direct, control and restrict the movement of vehicular and pedestrian traffic for the facilitation of traffic and the convenience of the public as well as the proper protection of human life and health; remove all nuisances in the public streets, parks and places; . . . and for these purposes to arrest all persons guilty of violating any law or ordinance for the suppression or punishment of crimes or offenses.
N.Y.C. Charter § 435(a).

zone, insisting on a constitutional right to demonstrate where they stood.  We need not decide whether Plaintiffs had to obey an unconstitutional order, because we have held that the order was constitutional.

Plaintiffs argue that there are genuine disputes as to what occurred during their interaction with the officers such that probable cause cannot be established on the undisputed factual record.  For example, Plaintiffs characterize their behavior toward the officers as cordial, and contend that they were compliant because they gravitated in the general direction of the demonstration zone.  But Plaintiffs made an audio recording of their interaction with the officers, and that recording dooms their assertion.  Although on summary judgment the evidence must be viewed in the light most favorable to Plaintiffs as the non-moving parties, when there is reliable objective evidence--such as a recording--the evidence may speak for itself.  See Scott v. Harris, 550 U.S. 372, 378-81 (2007).  Here, even viewed in the light most favorable to Plaintiffs, the audio recording shows indisputably that they were neither courteous nor compliant.  Plaintiffs were hostile and non-compliant; in effect, they courted arrest.  The officers could have perceived that Plaintiffs were obstructing governmental administration and failing to comply with a

27

police order to disperse.  Since the police therefore had probable cause to arrest, Plaintiffs' Fourth Amendment claim was correctly dismissed.[7]

**CONCLUSION**

Plaintiffs' motion, dkt. 31, to file a non-conforming appendix is granted.  The judgment of the district court is affirmed.

---

[7] Captain Staples also argues that he is entitled to qualified immunity.  Because we conclude there was probable cause for Plaintiffs' arrest, a fortiori he would be entitled to qualified immunity on this claim.  See Escalera v. Lunn, 361 F.3d 737, 743 (2d Cir. 2004) (holding that an officer is entitled to qualified immunity so long as it was not obvious that there was no probable cause).