*Berg et al. v. N.Y.C. Police Comm'r et al.*

## In the
## United States Court of Appeals
## For the Second Circuit

August Term, 2017

Argued: October 4, 2017
Decided: July 25, 2018

Docket No. 16-3146-cv

PHOEBE BERG, individually and on behalf of a class of all others similarly situated, TOSHIRO KIDA, individually and on behalf of a class of all others similarly situated, JOHN RIVERA, individually and on behalf of a class of all others similarly situated, DAYNA ROZENTAL, individually and on behalf of a class of all others similarly situated, JONATHAN JETTER, individually and on behalf of a class of all others similarly situated,

*Plaintiffs - Appellees*,

v.

NYCP COMMISSIONER RAYMOND KELLY, CHIEF OF NYC P.D. JOSEPH ESPOSITO, JAMES MCNAMARA, DEPUTY CHIEF, in his individual and official capacities, PETER LOEHLE, INSPECTOR, in his individual and official capacities, STEPHEN LATALARDO, LIEUTENANT, in his individual and official capacities,

JOHN DOE, NEW YORK CITY POLICE DEPARTMENT, (whose identity is not currently known but who are known to be police officers and/or supervisory personnel of the New York City Police Department); in his individual and official capacities,[1]

*Defendants - Appellants.*

---

Appeal from the United States District Court
for the Southern District of New York
No. 12-cv-3391 – Thomas P. Griesa, *Judge.*

---

Before:        RAGGI, HALL, and CARNEY, *Circuit Judges.*

Members of Occupy Wall Street ("OWS protesters" or "protesters") assert that a group of New York City Police Officers (the "Officers") unlawfully detained them during a protest outside the Sheraton Hotel where President Obama was attending a fundraising dinner. The protesters claim that this detention violated their First, Fourth, and Fourteenth Amendment rights. Concluding that the Officers' motivation for the detention was a material fact in dispute and that a finding as to the Officers' motivation affected the determination of the objective reasonableness of the Officers' actions, the district court denied the Officers summary judgment on the protesters' First, Fourth, and Fourteenth Amendment claims, and denied the Officers qualified immunity. The Officers appealed. This court denied the protesters' motion to dismiss this appeal for lack of subject matter jurisdiction. The Officers argue before us that the limited detention that occurred was permissible under the special needs exception to the Fourth Amendment so as not to violate the protesters' constitutional rights and, in any event, they are entitled to qualified immunity.

---

[1]        The Clerk of Court directed to amend the official caption in this case as set forth above.

We identify disputes of fact that do not permit a court to conclude as a matter of law that the protesters' two-hour detention was permissible under the special needs exception to the Fourth Amendment's warrant requirement. We nonetheless conclude that the officers are entitled to qualified immunity. The district court erred in concluding that the Officers' subjective intent in temporarily detaining the protesters was relevant to whether the Officers are entitled to qualified immunity. Considered objectively, we conclude that, at the time of the challenged actions, reasonable officers could have believed that the approximately two-hour detention of the protesters in response to concerns for the President's security was justified in light of then established law. Because the Officers could have reasonably believed the temporary detention was lawful, they are also entitled to qualified immunity on the OWS protesters' First Amendment and Fourteenth Amendment claims.

REVERSED AND REMANDED.

————————

KATHY CHANG PARK, Assistant Corporation Counsel (Richard Dearing and Claude S. Platton, *on the brief*), *on behalf of* Zachary W. Carter, Corporation Counsel of the City of New York, New York, New York, *for Defendants-Appellants*.

DAVID B. RANKIN, Beldock Levine & Hoffman LLP, New York, New York, *for Plaintiffs-Appellees*.

————————

HALL, *Circuit Judge*:

This is an appeal from an order entered on August 10, 2016, in the

Southern District of New York (Griesa, *J.*), denying summary judgment in

3

part to Defendants-Appellants Police Officers (the "Officers"), who claimed qualified immunity from suit by Plaintiffs-Appellees, participants in an Occupy Wall Street protest.[2] The named protesters assert that the Officers unlawfully detained them and other putative class members during a protest outside the Sheraton Hotel where President Obama was attending a fund-raising dinner on November 30, 2011. Before us on appeal are the protesters' claims that this detention violated their Fourth Amendment rights, that the detention was in retaliation for their exercise of First Amendment rights, that they were subjected to selective enforcement in violation of the Fourteenth Amendment, and that certain officers failed to intervene to protect their constitutional rights.[3] The Officers argue that they are entitled to summary judgment based on qualified immunity because: (1) under the special needs exception to the Fourth Amendment, there was no constitutional violation; and (2) even if the detention that occurred were determined to be

---

[2]     The Plaintiffs-Appellees will be referred to as "OWS protesters" or "protesters."

[3]     The OWS protesters assert failure to intervene claims against Defendants James McNamara, Peter Loehle, and Stephen Latalardo. McNamara was the officer in command in the area of the Sheraton. Loehle was the sector commander for the area encompassing the Sheraton. And Latalardo admits he may have been the officer that actually closed and opened the press pen where the OWS protesters was detained.

4

unconstitutional, there was no clearly established law doing so at the time their actions were taken.

On the record before us, we conclude that the Officers have not demonstrated that, as a matter of law, the protesters' two-hour detention was justified under the "special needs" exception to the Fourth Amendment's warrant requirement. This is not to dismiss the possibility of additional evidence being introduced at a trial to support such a conclusion. But no such trial is warranted here because, as to the second argument, we conclude that the Officers are entitled to qualified immunity. At the time of the detentions at issue, it was not clearly established that the Fourth Amendment did not permit officers protecting the President of the United States to detain protesters as occurred in this case. We further conclude that because the Officers have qualified immunity from the OWS protesters' Fourth Amendment claims, they are also entitled to qualified immunity on the OWS protesters' related First Amendment and failure to intervene claims. As to the OWS protesters' Fourteenth Amendment claims for selective enforcement, the Officers are entitled to qualified immunity because reasonable officers could disagree as to whether the plaintiffs' status as protesters

presented unique concerns that non-protesters on the scene did not. We proceed to explain these conclusions.

## I.

On the night of November 30, 2011, the OWS protesters planned to protest a fundraising dinner for President Obama at the Sheraton Hotel in midtown Manhattan. Because part of the protesters' message was aimed at keeping money out of politics, the point of that night's protest was to bring attention to the President's fundraiser. Through various social media accounts, the OWS protesters had advertised the protest using hashtags such as #OccupyObama and #DinnerWithBarack.

The President's visit occurred the same night as the annual Christmas tree lighting at Rockefeller Center, less than a quarter mile from the Sheraton. The New York City Police Department ("N.Y.P.D.") had responded to a bomb threat at Rockefeller Center approximately one hour prior to President Obama's arrival at the Sheraton.

The OWS protest began in Bryant Park, at 42nd Street and 6th Avenue. The protesters intended to march about ten blocks northwest toward the Sheraton Hotel at 53rd Street and 7th Avenue to confront the President.

As the protesters marched toward the Sheraton, they first stopped on 51st Street and 7th Avenue, in an area the N.Y.P.D. had previously designated as the "demonstration area." The protesters, however, opted not to remain in the demonstration area, but continued to march toward the Sheraton, ultimately stopping at approximately 8:00 p.m., on the southwest corner of 53rd Street and 7th Avenue. The protesters stopped there because the N.Y.P.D. had restricted pedestrian traffic any closer to the Sheraton. This landed the OWS protesters directly across the street from the hotel and within the President's line of sight as he entered and exited.

According to the N.Y.P.D. plans, the area near the southwest corner of 53rd Street and 7th Avenue was designated the "press pen." Partially enclosed by barriers on three sides, the press pen was reserved for individual press members holding certain security credentials. Although not members of the press, much less credentialed, OWS protesters chose to gather in the press pen because it was closer to the President than their designated demonstration area at 51st Street and 7th Avenue.

Shortly before the President's arrival at approximately 8:50 p.m., the N.Y.P.D. established a "frozen zone" for a period of time during which vehicular and pedestrian traffic was restricted in the area surrounding the hotel. The "frozen zone" extended from 6th Avenue to Broadway and from West 52nd Street to West 53rd Street. Dump trucks were also placed in front of the Sheraton to prevent cars from driving into the hotel and to protect against explosives.

At some point, the Officers placed an additional barricade on the "press pen," enclosing it on all four sides. It is unclear whether this closure occurred before or after the President's arrival, and the Officers cannot identify who ordered the closure. After the last barricade was put in place, OWS protesters learned that they were not permitted to leave the area because the area had been ordered "frozen." The Officers advised the protesters that they could expect to be released from the press pen once President Obama was safely inside the Sheraton. Subsequently, the Officers advised the protesters that they would be released after President Obama left the vicinity.

The protesters could not leave the press pen until the N.Y.P.D. permitted them to do so.[4]

After the President arrived at the Sheraton and while he was inside the hotel, the Officers allowed traffic and pedestrians to flow freely on 7th Avenue. The OWS protesters, however, were required to remain in the press pen. Indeed, the Officers threatened to arrest any OWS protesters who tried to leave the press pen. Meanwhile, tourists and journalists in the press pen were allowed to leave. During the President's time at the Sheraton, two protesters in the press pen developed health issues, and the Officers offered to call for an ambulance. One of those protesters chose to stay; the other left by ambulance. Shortly after the President departed the hotel at 10:25 p.m., the protesters were permitted to leave the press pen.

The OWS protesters filed this lawsuit asserting federal claims under 42 U.S.C. § 1983 that the Officers had violated their First, Fourth, and Fourteenth Amendment rights, both directly by detaining them and indirectly by failing to intervene to stop the constitutional violations. The protesters further asserted state law claims based on the same conduct. The Officers

---

[4]     Undisputedly authentic video evidence, part of the record on appeal, captured much of the scene.

moved for summary judgment on the grounds that the protesters' constitutional challenges failed as a matter of law and that, even if they did not fail, the Officers were entitled to qualified immunity.[5]

The district court determined there was a dispute of material fact with respect to the Officers' motive for fully enclosing the press pen. On the basis of that factual dispute, which the court determined precluded recognition of qualified immunity, it denied the Officers summary judgment on the OWS protesters' federal claims. According to the district court, if the Officers had detained the protesters due to a motivation "more sinister" than "presidential security," a proposition the court had to assume on summary judgment, then "clearly established law at the time of [the] detention could support" each of the OWS protesters' § 1983 claims. *Berg et al. v. New York City Police Comm'r Raymond Kelly et al.*, No. 12-cv-3391 (TPG), 2016 WL 4257525, at *6 (S.D.N.Y. Aug. 10, 2016).

---

[5] The district court dismissed the protesters' claims against Raymond Kelly, Commissioner of the N.Y.P.D., and Joseph Esposito, Chief of Department of the N.Y.P.D. Because the protesters' complaint barely mentioned these defendants, and neither was present at the protest, the district court concluded the protesters' claims against these officers failed as a matter of law. It also dismissed the protesters' state law claims as duplicative of its federal claims. Neither of these rulings are at issue on this appeal.

The Officers appealed from the district court's ruling denying them qualified immunity. Before this Court the protesters moved to dismiss for lack of appellate jurisdiction. We denied the OWS protesters' motion and concluded that we have jurisdiction over this appeal "to the extent that [the Officers] can support their defense on [the protesters'] 'version of the facts that the district judge deemed available for jury resolution.'" Order, No. 16-3146 (Jan 11, 2017) (quoting *Lynch v. Ackley*, 811 F.3d 569, 576 (2d Cir. 2016)).

The gravamen of Appellant Officers' argument is that the special needs exception applicable to the analysis of Fourth Amendment seizures, *see Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 449 – 50 (1990), justified their almost two-hour-long detention of the OWS protesters in the vicinity of where the President was attending a fundraising dinner. According to the Officers, the circumstances requiring them to focus their attention on the President's security were a sufficient basis to except the detention of the protesters from the Fourth Amendment's requirement that their seizure be supported by probable cause, and in any event, it was reasonable for the Officers to believe that their actions were lawful given existing precedent. Appellee OWS protesters, on the other hand, would have us ignore whether it was

objectively reasonable for the Officers to believe, under the circumstances, that they were acting within the dictates of the law. Instead, the protesters want this Court to hold, regardless of the objective reasonableness of the Officers' actions, that the Officers are not entitled to qualified immunity once we determine they violated a clearly established right. In so urging, Appellees argue that the Officers' subjective intent in applying the special needs exception is in dispute, and thus the Officers are not entitled to qualified immunity on summary judgment. The OWS protesters dispute, in any event, whether a special needs exception should apply in the context of what occurred in this case.

In the analysis that follows, we address first the question of jurisdiction and conclude that we have jurisdiction to resolve the Officers' appeal in the procedural posture presented. We then consider whether the Officers are entitled to summary judgment because there was no violation of the protesters' Fourth Amendment rights. Because that conclusion cannot be reached as a matter of law on the present record, we proceed to consider whether the Officers are entitled to qualified immunity in any event because then-existing law did not clearly establish the unconstitutionality of the

challenged detentions. We conclude that the Officers do have qualified immunity from the protesters' Fourth Amendment claims and that such immunity also bars the OWS protesters' remaining claims under the First and Fourteenth Amendments.

**III.**

We have appellate jurisdiction under the collateral order doctrine to hear an interlocutory appeal from the district court's denial of qualified immunity. *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). Where, as here, denial of qualified immunity turns on questions of law, the court's decision constitutes a final appealable order under 28 U.S.C. § 1291 that we review *de novo*. *Clubside, Inc. v. Valentin*, 468 F.3d 144, 151 – 52 (2d Cir. 2006). The Officers having moved for summary judgment, we construe the evidence in the light most favorable to the OWS protesters. *See id*. Summary judgment may be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

**IV.**

In *Saucier v. Katz*, 533 U.S. 194, 200 (2001), the Supreme Court held that, when confronted with a question of law regarding the applicability of

qualified immunity in a Section 1983 suit, federal courts should first determine "whether a constitutional right would have been violated on the facts alleged," proceeding to the question of whether the right was clearly established only if they answer the first question in the affirmative. The Court altered that framework eight years later in *Pearson v. Callahan*, 555 U.S. 223 (2009), holding that "courts should have the discretion to decide whether [the *Saucier*] procedure is worthwhile in particular cases." *Id.* at 242. Because the question presented here "do[es] not frequently arise in cases in which a qualified immunity defense is unavailable," *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2020 (2014), we think it will be "worthwhile" to exercise that discretion here, *Pearson*, 555 U.S. at 242. Accordingly, we first address whether, taking the facts in the light most favorable to the protesters, the Officers are entitled to summary judgment because no constitutional violation occurred. We decide that we cannot reach that conclusion as a matter of law on the present record.

**A.**

The OWS protesters assert they were falsely arrested in violation of their Fourth Amendment right to be free from unreasonable seizures when

14

they were detained in the press pen for approximately two hours while the President was across the street and inside the Sheraton Hotel. To establish a § 1983 claim for false arrest, the OWS protesters must adduce evidence that: (i) the Officers intended to confine them; (ii) OWS protesters were conscious of the confinement and did not consent to it; (iii) the OWS protesters did not consent to being confined; and (iv) the confinement was not otherwise privileged. *Jocks v. Tavernier*, 316 F.3d 128, 134 – 35 (2d Cir. 2003) (citation omitted). The protesters' ability to satisfy the first three requirements is not disputed; what is at issue is whether the detention was privileged under the "special needs" exception to the Fourth Amendment's general probable cause requirement. *See, e.g.*, *City of Indianapolis v. Edmond*, 531 U.S. 32, 54 (2000).

The special needs exception recognizes as constitutionally reasonable limited searches or temporary seizures that serve "special needs beyond the normal need for law enforcement," where "the warrant and probable-cause requirement [are] impracticable." *Skinner v. Railway Labor Execs. Ass'n*, 489 U.S. 602, 619 (1989) (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987)); *see also Ferguson v. City of Charleston*, 532 U.S. 67, 79 – 85 (2001) (explaining,

in the search context, that the special need must be separate from the general interest in crime control); *Edmond*, 531 U.S. at 37 (collecting special needs cases). After a court determines whether the search or seizure served a "special need" distinct from "the ordinary evidence gathering associated with crime investigation," it must evaluate whether the search or seizure was "reasonable" in light of competing governmental and individual considerations. *MacWade v. Kelly*, 460 F.3d 260, 268 – 69 (2d Cir. 2006) (quoting *Nicholas v. Goord*, 430 F.3d 652, 663 (2d Cir. 2005)).

**B.**

Here, the professed special need is protecting the President of the United States. As the Supreme Court has recognized, even in cases where the special needs doctrine was not involved, the "Nation undoubtedly has a valid, even an overwhelming, interest in protecting the safety of its Chief Executive and in allowing him to perform his duties without interference from threats." *Watts v. United States*, 394 U.S. 705, 707 (1969); *see also Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (the principle of qualified immunity—that "officials should not err always on the side of caution" for "fear of being sued"—is "nowhere more important than when the specter of Presidential

16

assassination is raised"); *id.* at 229 – 30 (Stevens, *J.*, dissenting) ("Those who guard the life of the President properly rely on the slightest bits of evidence—nothing more than hunches or suspicion—in taking precautions to avoid the ever-present danger of assassination." (internal quotation marks and citation omitted)).

This precedent informed the District of Columbia Circuit's rejection of a Fourth Amendment challenge to the Office of Management and Budget's policy requiring those of its employees with access to areas frequented by the President or Vice President to undergo random drug testing. *Stigile v. Clinton*, 110 F.3d 801, 802 (D.C. Cir. 1997). In concluding that "the random drug testing at issue here is justified as a means of protecting the safety of the President and the Vice President," the Court recognized the special need to protect the President and Vice President, which was "clearly beyond the normal need for law enforcement" but of the "utmost importance" because "[f]ew events debilitate the nation more than the assassination of a President." *Id.* at 802 – 03 (internal quotation marks omitted).

In recent years, the Supreme Court has emphasized the importance of Presidential safety in the context of granting qualified immunity to officers

sued for actions taken to protect the President or Vice President. In *Saucier*, the Court ruled that a military police officer was qualifiedly immune from suit for using excessive force against a person protesting a speech by Vice President Gore. 533 U.S. at 208 – 09. The Court observed that the officer "did not know the full extent of the threat respondent posed or how many other persons there might be who, in concert with respondent, posed a threat to the security of the Vice President," and, given that "[t]here were other potential protesters in the crowd," the officer "was required to recognize the necessity to protect the Vice President by securing respondent and restoring order to the scene." *Id.* at 208. Thus, the Court concluded that "[i]t cannot be said there was a clearly established rule that would prohibit using the force petitioner did . . . ." *Id.* at 208 – 09.

In *Reichle v. Howards*, 566 U.S. 658, 660 (2012), the Court held Secret Service agents immune from suit for the retaliatory arrest of a person protesting Vice President Cheney because they had probable cause to think the protester had committed a federal crime. Justice Ginsburg, concurring in that decision, observed that "[o]fficers assigned to protect public officials must make singularly swift, on the spot, decisions whether the safety of the

18

person they are guarding is in jeopardy." *Id.* at 671. Most recently, in *Wood v. Moss*, 134 S. Ct. 2056 (2014), the Supreme Court granted Secret Service agents qualified immunity from a First Amendment suit by persons asserting their opposition to President George W. Bush. The protesters complained that, after the President made an unplanned stop at a restaurant, they were moved to a site further away from him while Bush supporters were not. *Id.* at 2061– 64. There was no claim of probable cause to think the protesters planned to commit any crime. Nevertheless, the Supreme Court concluded that the agents' actions were objectively reasonable in light of a valid security concern that the anti-Bush protesters, before they were relocated, were within "weapons range" of the President dining on the patio. *Id.* at 2070. The Secret Service's maps and travel plans, moreover, refuted arguments that the basis for relocating the protesters was their political viewpoints. *Id.* at 2069.

Of this precedent, only *Stigile* directly identifies protection of the President as a "special need," and it does so in the context of a search, not a seizure. Nonetheless, these cases all generally recognize protection of the

President as a special need apart from routine law enforcement. *See Ferguson*, 532 U.S. at 79 (identifying special needs as those "divorced from the State's general interest in law enforcement").

In light of the Supreme Court's long recognition of the importance of protecting the President of the United States, we conclude that, as a matter of law, the circumstances of November 30, 2011, presented Officers with a special need.

## C.

Having identified a special need, to assess the reasonableness of the Officers' detention actions we must weigh the public interest served by those actions against the intrusion on the OWS protesters' Fourth Amendment right to be free from unreasonable seizures. *See Skinner*, 489 U.S. at 619; *cf. Terry v. Ohio*, 392 U.S. 1, 16 (1968) ("[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person."). We have identified four "balancing factors" that are relevant to the reasonableness inquiry in the "special needs" context:

> (1) the weight and immediacy of the government interest;
> (2) the nature of the [liberty] interest allegedly compromised

20

by the [detention]; (3) the character of the [deprivation] imposed by the [detention]; and (4) the efficacy of the [detention] in advancing the government interest.

*MacWade*, 460 F.3d at 269 (internal quotation marks and citations omitted).

For the reasons explained above, protecting the President's safety is a uniquely important government interest. *See Wood*, 134 S. Ct. at 2067 (recognizing the "overwhelming[] interest in protecting the safety of [the] Chief Executive" (quoting *Watts*, 394 U.S. at 707)). But the liberty interest compromised by the protesters' detention is not to be dismissed out of hand, particularly given that its almost-two hours' duration is a far cry from the *de minimis* vehicle detentions that have previously been approved under the special needs exception. *See, e.g.*, *Illinois v. Lidster*, 540 U.S. 419, 427 (2004) (police information checkpoint regarding hit-and-run required "only a brief wait in line—a very few minutes at most" and "only a few seconds" of police contact); *Sitz*, 496 U.S. at 448 (average delay for each vehicle at sobriety checkpoint was approximately 25 seconds); *United States v. Martinez-Fuerte*, 428 U.S. 543, 547 (1976) (average length of inspection at vehicle checkpoint near border was three to five minutes). Moreover, for the two hours they were detained, the protesters could not use a restroom. And those who felt

ill were forced to choose between waiting out the detention period and departing by ambulance.

We recognize, as the Officers argue, that the protesters' loss of liberty was limited to their freedom to depart the area for the two hours at issue. Specifically, the protesters were not handcuffed, searched, questioned, or transported to a police station. But this does not allow a court to conclude as a matter of law that the two-hour detention was a reasonable means of meeting the special need presented. Non-protesters, for example, were permitted to leave the area after President Obama entered the Sheraton and was no longer in the line of sight of those on Seventh Avenue. The Officers contend that the protesters presented unique security concerns because of the size of their group (more than 50), but no evidence was adduced as to why, after the President had entered the hotel and for the two hours he remained there, the protesters could not have been released from the press pen to proceed out of the area in smaller groups over time.

The record evidence regarding relevant police practices is sparse. What there is does not compel the legal conclusion of special needs urged

by the Officers. To the contrary, the NYPD's own Patrol Guide advises officers to permit demonstrators "to leave a barriered area at any time." Appendix at 572. To be sure, this advice pertains to protesters generally, not to circumstances involving the President. But no record evidence identifies a risk to President Obama's safety if the protesters were permitted to leave in small groups, as provided in the Guide.[6] Accordingly, on the record at summary judgment, we cannot conclude as a matter of law that there was "'a close and substantial relationship' . . . between the degree of intrusiveness [on the protesters' liberty interests] and the governmental need asserted." *Cassidy v. Chertoff*, 471 F.3d 67, 81 (2d Cir. 2006) (quoting *United States v. Lifshitz*, 369 F.3d 173, 186 (2d Cir. 2004).

## V.

Qualified immunity protects officers from suit so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). We "do[ ] not require a case directly on point for a right

---

[6] This is not to say that the Officers could not introduce evidence to support a finding of efficacy. But, in the absence of such evidence, we cannot conclude on summary judgment that the protesters' detention advanced President Obama's physical safety so as to be reasonable in light of the special need presented.

23

to be clearly established"; nevertheless, "existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (citation and internal quotation marks omitted). This is because qualified immunity "protects all but the plainly incompetent or those who *knowingly* violate the law." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (citation and internal quotation marks omitted) (emphasis added).

Thus, "the qualified immunity defense . . . protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Taravella v. Town of Wolcott*, 599 F.3d 129, 134 (2d Cir. 2010) (citation omitted). "[W]hether a defendant official's conduct was *objectively* reasonable, *i.e.*, whether a reasonable official would reasonably believe his conduct did not violate a clearly established right, is a mixed question of law and fact." *Id.* (citation and internal quotation marks omitted) (emphasis added). Even so, the objective legal reasonableness of an officer's action can be decided as a matter of law "in those cases where the facts con-

cerning the availability of the defense are undisputed" or viewed most favorably to plaintiffs. *Higazy v. Templeton*, 505 F.3d 161, 170, 174 (2d Cir. 2007) (citation and internal quotation marks omitted).

In applying these principles here, we begin with the district court's conclusion that "*why* the protesters were detained" presented a genuine issue of material fact that precluded summary judgment. *Berg*, 2016 WL 4257525, at *4 (emphasis in original) (noting that even the N.Y.P.D. sector commander "admitted that he was unaware of any reason why his officers closed the press pen"). The conclusion runs afoul of existing precedent, which holds that "determining whether official conduct was objectively reasonable requires examination of the information possessed by the officials at that time (without consideration of subjective intent)." *Connecticut ex rel. Blumenthal v. Crotty*, 346 F.3d 84, 106 (2d Cir. 2003) (alteration, citation, and internal quotation marks omitted); *accord Garcia v. Does*, 779 F.3d 84, 92 (2d Cir. 2015). In *Crotty*, we held that the "intent, motive or beliefs" of officials in enforcing the Nonresident Lobster Law (which was subsequently found to be unconstitutional) were irrelevant to the qualified immunity analysis. 346 F.3d at 106. This is because "[i]nclusion of a subjective component, as

the Supreme Court instructed, produces inconsistent results and defeats the purpose of the doctrine by creating a factual issue requiring resolution by a jury." *Id*. (citing *Harlow*, 457 U.S. at 815–16). In *Garcia*, we held that officers were entitled to qualified immunity against a suit for false arrest brought by a group of plaintiffs who had been arrested during a demonstration in support of Occupy Wall Street. There it was undisputed that the defendants "had, from their personal observations, sufficient evidence to establish probable cause on each of the elements of a disorderly conduct violation." 779 F.3d at 92. In such circumstances, it was objectively reasonable for defendants to arrest the protesters. In urging otherwise, the *Garcia* plaintiffs argued that they reasonably believed the defendants had given them permission to cross the Brooklyn Bridge on the vehicular roadway. *Id*. at 93. The court explained that the plaintiffs' beliefs were not relevant to the qualified immunity analysis. *Id.* And further, the defendant police officers were entitled to qualified immunity because even in the "confused and boisterous situation" in which they found themselves, it was objectively reasonable for them to think that the plaintiffs were illegally blocking a roadway and that

"no official had expressly authorized the protesters to cross the Bridge via the roadway." *Id.* at 93.

The OWS protesters here argue that because "the [Officers] cannot identify the individual who made the decision, much less a non-speculative justification for the decision to trap the demonstrators," the Officers are not entitled to qualified immunity. Appellees' Br. at 19. That reasoning is misguided.[7] In a court's analysis of probable cause for an arrest, it is clear that "an arresting officer's state of mind . . . is irrelevant to the existence of probable cause"; indeed, the officer's "subjective reason for making the arrest need not be the criminal offense as to which the known facts [objectively] provide probable cause." *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004). Stated differently, "a claim for false arrest turns only on whether probable cause existed to arrest a defendant, and . . . it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of the arrest." *Jaegly v. Couch*, 439 F.3d 149, 154 (2d Cir. 2006). In both *Devenpeck* and *Jaegly* it was

---

[7] Although the protesters did not raise this specific argument before the district court, the district court did consider its substance as one of the factors in determining that the Officers were not entitled to qualified immunity. *Berg*, 2016 WL 4257525, at \*4.

27

held that officers who had objective probable cause to arrest individuals for *any* crime—whether or not that particular crime was closely related to the offense the officers said was the reason for arrest—were not subject to damages for false arrest under § 1983.

**A.**

We have applied an objective analytical framework when assessing qualified immunity based on special need. *See Moore v. Vega*, 371 F.3d 110, 116 (2d Cir. 2004) (stating that where qualified immunity is based on claimed special need to search parolee's residence, the issue "is whether, in light of clearly established law and the information they possessed, the defendants could have reasonably believed their search of plaintiff's home to be lawful"). So here, we ask whether, under well-established law at the time, and based on these facts, an officer could reasonably have believed that the actions taken to detain the OWS protesters were lawful in light of the special need to protect the President. *Saucier*, 533 U.S. at 202. We answer that inquiry in the affirmative.

Few cases address the manner in which a *detention* (as opposed to a search) should be balanced against a governmental interest in the "special

28

needs" context. Nevertheless, the cases addressing the particular special need at issue here have emphasized the critical importance of protecting Presidential safety. *See Hunter*, 502 U.S. at 229 (noting that qualified immunity's tolerance for reasonable error "is nowhere more important" than when protecting the life of the President).

In light of the government's well-recognized "overwhelming" interest in the President's safety, *Wood*, 134 S. Ct. at 2067, an objectively reasonable officer could have thought that the temporary detention here offered a permissible method of serving the heightened security need that exists during a Presidential visit.

Protecting the President in New York City routinely involves closing streets and cutting off traffic. *See, e.g.*, Sarah Maslin Nir, *One-Man Traffic Jam Will Hit City When Trump Visits*, N.Y. Times, Jan. 28, 2017, at A18; *Obama in NYC Thursday for Fundraisers; Traffic Alerts*, NBC New York, June 22, 2011. We have also observed, even in the First Amendment context, that "the government ha[s] a significant interest in ensuring that [a] protest remain[s] within [a designated area]." *Kass v. City of New York*, 864 F.3d 200, 208 (2d Cir. 2017). In *Kass*, the applicable interest was "maintaining public safety and

29

order" and keeping public spaces "safe and free of congestion." *Id.* (internal quotation marks omitted). The interest in protecting the President can be seen as of even greater public importance. *See Watts*, 394 U.S. at 707. Officers charged with the duty of protecting the President reasonably could have concluded that—where OWS protesters had left the unrestricted designated protest area and entered an area set aside not for them but for the press—a reasonable way to allow the protesters to pursue their protest without risk that they would attempt to get closer still to the President was to require them to remain in the press pen until the President departed the area. With the benefit of hindsight, other means might be imagined to safeguard the President while also allowing plaintiffs to protest with less restriction on their freedom of movement. But the officers were balancing a number of legitimate concerns, including consideration for First and Fourth Amendment rights, in a dynamic situation. At the time in question no clearly established law signaled that the Officers' conduct fell outside the special needs doctrine.

Indeed, in the context of a routine law enforcement stop, a police officer with reasonable suspicion of criminal activity can detain a person for such time as is reasonably necessary to resolve that suspicion. *See Terry*, 392

30

U.S. at 21; *Grice v. McVeigh*, 873 F.3d 162, 167 – 68 (2d Cir. 2017). Police officers charged with protecting the President thus might have reasonably believed that they could temporarily deny freedom of movement to persons on the scene, perhaps even until the President had departed. In short, while the present record does not permit us to conclude, as a matter of law, that the Officers' actions went no further than the special need to protect the President warranted, no then clearly established law would have alerted reasonable officers that their actions did not fall within the special needs exception.

Nor is a different conclusion warranted because the police did not deny all pedestrians and traffic movement to the same degree as the protesters. Reasonable officers might have been particularly alert to risks posed by the Occupy Wall Street protesters, whose professed intent was to "#OccupyObama." *See Reichle*, 566 U.S. at 672 (Ginsburg, *J.*, concurring) (finding that Secret Service agents were "duty bound" to take into account the content of an anti-Iraq-War protester's statement to the Vice President when assessing whether he posed a threat). That a reasonable officer might objectively think that OWS protesters would not leave the area upon release but,

rather, would attempt to approach or gain access to the hotel and the President found some support in other OWS protesters' actions only weeks earlier in shutting down the Brooklyn Bridge. *See Garcia*, 779 F.3d at 88 (describing Occupy Wall Street October 1, 2011 demonstration precluding traffic moving on Brooklyn Bridge).

In sum, in the absence of clearly established law prohibiting the challenged detentions in the circumstances presented, the Officers are entitled to qualified immunity. *See Pauly*, 137 S. Ct. at 552 (requiring that "clearly established law" be "particularized to the facts of the case" (internal quotation marks omitted)).

**B.**

The OWS protesters also assert that they were unlawfully detained for the duration of the President's visit in retaliation for exercising their First Amendment rights. Because the Officers have qualified immunity from suit based on their temporary detention of the protesters, these claims also fail.

In *Singer v. Fulton County Sheriff*, 63 F.3d 110, 120 (2d Cir. 1995), we concluded that "if [an] officer either had probable cause or was qualifiedly immune from subsequent suit (due to an objectively reasonable belief that

32

he had probable cause), then we will not examine the officer's underlying motive in arresting and charging the plaintiff." The same reasoning applies to qualified immunity based on an objectively reasonable belief of special needs. We have determined above that officers in the position of protecting the President, as here, would have an objectively reasonable belief under the circumstances that the special needs presented in this case justified their limited detention of the protesters. Our rationale in *Singer* thus accords the Officers qualified immunity from the protesters' retaliation claims.

## C.

The protesters' claim that certain officers failed to intervene to protect constitutional violations likewise fails. To recover on a claim for "[f]ailure to intercede to prevent an unlawful arrest," plaintiffs "must still overcome the hurdle of qualified immunity." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 129 (2d Cir. 1997). A non-intervening police officer becomes liable when "such failure permitted fellow officers to violate . . . clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* (citation and internal quotation marks omitted). For the same reasons the Officers have qualified immunity for OWS's detention, it was

33

not "objectively unreasonable" for Officers McNamara, Loehle, and Latalardo to conclude that their "fellow Officers' conduct did not violate" OWS's rights. *Id.*

**D.**

The Officers are also entitled to qualified immunity on OWS's selective enforcement claim. To assert a claim for selective enforcement, a plaintiff must allege: "(1) [that] the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as . . . the exercise of constitutional rights . . . ." *LaTrieste Rest. & Cabaret Inc. v. Vill. of Port Chester*, 40 F.3d 587, 590 (2d Cir. 1994) (quoting *LeClair v. Saunders*, 627 F.2d 606, 609 – 10 (2d Cir. 1980)).

The Officers argue that in light of *Marcavage v. City of New York*, 689 F.3d 98 (2d Cir. 2012) and *Wood*, it is unclear that protesters are similarly situated to the general public when Presidential security is concerned. We agree.

34

In *Marcavage*, we held that officers' establishment of a "no-demonstration zone," which permitted pedestrians and ordinary traffic but not protesters on the sidewalk in front of Madison Square Garden, was a reasonable time, place, and manner restriction, narrowly tailored to the security risks raised by a large group of protesters. 689 F.3d at 104 – 05. The officers had blocked off the sidewalk in response to a convention that both the President and the Vice President were attending. Under *Marcavage*, it is clear reasonable officers could proceed on the understanding that the presence of protesters on a sidewalk outside a building where the President was located raised unique concerns that are not raised by the presence of ordinary (non-protester) pedestrians. *Id.* at 105.

In *Wood*, the anti-Bush protesters argued that "had the agents' professed interest in the President's safety been sincere, the agents would have directed all persons present . . . to be screened or removed from the premises." 134 S. Ct. at 2069. Important to our analysis here, the Court in *Wood* concluded that the individuals dining in the restaurant did not pose the same type of security risks as a group of 200 to 300 people standing outside the restaurant. *Id.* That the members of the public dining in the restaurant

did not choose that location to confront the President, and "could not have had any expectation that they would see the President that evening," rendered the security concerns raised by the protesters distinct from average diners. *Id.*

It is undisputed that the OWS protesters had pre-planned their protest to challenge the President's fundraising dinner, promoted the event through social media, and adapted their plan to be as close to the President as possible. The size of the protest, which, according to the protesters, consisted of anywhere from 75 to 200 people, presented unique security concerns. *See Wood*, 134 S. Ct. at 2069 (explaining that "[t]he Secret Service . . . could take measures to ensure that the relatively small number of people already inside the Inn were kept under close watch; no similar surveillance would have been possible for 200 to 300 people congregating in front of the Inn"). At bottom, a reasonable officer could believe that the OWS protesters were engaged in conduct different from that of regular pedestrians and that the protesters therefore were not similarly situated to those pedestrians. *See Marcavage*, 689 F.3d at 106 – 07. The Officers are thus entitled to qualified immunity on OWS's selective enforcement claims.

**VI.**

Protecting the President's safety is among the most important of law enforcement duties. The assassination of a President does violence not only to the individual who occupies the office and to the stability of the nation but also to the democratic ideals that guide our system of government. At the same time, the Constitution guarantees citizens freedom from unwarranted infringement of their rights to freedom of expression and movement.

For the reasons stated, we cannot conclude that the Officers balanced those competing considerations here in a way that violated clearly established law. We thus decide that they are entitled to qualified immunity on the claims asserted against them. The decision of the district court denying the Officers qualified immunity is reversed. The case is remanded with instructions to dismiss the complaint with prejudice.